IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ALAN MCFADDEN                                                                                         PLAINTIFF

v.                                                                            Civil Action No. 3:11-cv-108-CWR-FKB

THE PRUDENTIAL INSURANCE COMPANY                                                              DEFENDANTS
OF AMERICA; ENCOMPASS MECHANICAL
SERVICES SOUTHEAST

# ORDER

Pending before the Court is The Prudential Insurance Company of America's motion for summary judgment. Docket No. 31. Alan McFadden opposes the motion and has filed a cross-motion for summary judgment.[1] Docket No. 35. Prudential has replied, Docket No. 44, McFadden has filed a sur-reply, Docket No. 45, and the matter is ready for disposition. After reviewing the administrative record, the pleadings, and the applicable law, Prudential's motion will be granted and McFadden's motion will be denied.

*I.      Background*

On January 12, 2002, McFadden was employed by Encompass Mechanical Services Southeast and assigned to repair the roof of a Nissan North America construction project. Docket No. 1, at 3. A helicopter delivering construction materials to the roof flew near McFadden and caused the roof to lift. *Id.* McFadden was thrown into the air and injured when he struck the roof. *Id.* He was subsequently awarded temporary and permanent workers' compensation benefits. *Id.* at 3-4. On February 5, 2005, McFadden was declared totally disabled by the Social Security Administration as of January 14, 2002. *Id.* at 4; *see* Docket No. 35, at 2.

On December 4, 2008, McFadden applied for short-term disability ("STD") and long-term

---

[1] Under the Case Management Order, dispositive motions were due November 2, 2011. Docket No. 18, at 3. Prudential moved for summary judgment on that date; McFadden did not. Instead, on November 16, McFadden filed a motion requesting "more time to respond to the defendants' motion for summary judgment." Docket No. 34, at 1. Nowhere in that document did he request leave to file a cross-motion for summary judgment out of time. The Court granted his request for additional time *to respond*. *See* Text-Only Order of Nov. 17, 2011.
  On December 1, though, McFadden filed a "Motion for Summary Judgment in Response to Defendants Motion for Summary Judgment." Docket No. 35, at 1. The deadline for such a motion had passed a month prior and no permission had been granted to file one out of time. For that reason alone, the cross-motion may be denied.
  Nevertheless, in the interest of resolving this dispute on the merits, and recognizing McFadden's *pro se* status – even though McFadden has experience with and displays an understanding of federal court rules and procedures – the Court will deem his response brief to be a cross-motion for summary judgment.

disability ("LTD") benefits under a group plan managed and underwritten by Prudential, Encompass's disability insurer. Docket No. 1, at 4. After an investigation, Prudential denied his claim. *Id.* at 6. In 2009 and 2010, two administrative appeals were also denied. *Id.* at 6-8. This lawsuit followed.

## II.     Arguments

Prudential first argues that the plain language of the policy prevents McFadden from receiving STD benefits because his injury occurred on the job. Docket No. 32, at 2-3 and 20. Regarding LTD benefits, it contends that objective medical tests conducted by several physicians could not verify McFadden's "subjective complaints of pain." *Id.* at 3-4 and 23-24. Instead, it says, the records show a pattern of McFadden's "drug seeking behavior" and "symptom magnification." *Id.* at 23. Prudential asserts that McFadden's delayed claim for benefits, filed almost seven years after his injury, left it "unable to obtain medical documentation contemporary to the injury" to resolve conflicts in the record. *Id.* at 4 and 25-26.

McFadden responds that he became aware of his right to seek STD and LTD benefits only through his filing of a separate, workers' compensation-related lawsuit, and that Prudential has not been prejudiced by the delay. Docket No. 35, at 2-4. He then argues he was entitled to discovery to clarify the evidence of his functional impairment. *Id.* at 7-8. Regarding STD benefits, McFadden contends that it was unfair for Prudential to have collected premiums for those benefits since it had no intent to pay valid claims. *Id.* at 10. He argues Prudential abused its discretion in denying LTD benefits because it ignored reports from the Workers' Compensation Commission, the Social Security Administration, and various medical providers who corroborate his functional impairment. *Id.* at 7 and 11-13.

Arguments contained in Prudential's rebuttal and McFadden's sur-reply will be mentioned where relevant below.

## III.     Standard of Review

"The summary judgment standard for ERISA claims is unique because the Court acts in an appellate capacity reviewing the decisions of the administrator of the plan." *Riley v. Blue Cross & Blue Shield of Mississippi*, No. 3:09-cv-674, 2011 WL 2946716, *1 (S.D. Miss. July 21, 2011).

"Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language." *Threadgill v. Prudential Securities Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998) (citation omitted). Because the ERISA plan grants Prudential "discretionary authority

2

to determine eligibility for benefits under the plan or to interpret the plan's provisions," the Court reviews Prudential's decision for abuse of discretion. *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 269 (5th Cir. 2004) (citation omitted). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 468 (5th Cir. 2010) (quotation marks and citation omitted). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail." *Id.* (citing *Ellis*, 394 F.3d at 273).[2] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis*, 394 F.3d at 273 (quotation marks and citation omitted). "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence." *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (quotation marks and citation omitted).

Restated, the question is whether Prudential's decision was supported by substantial evidence, "*not* [whether] substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis*, 394 F.3d at 273 (citation omitted). "We are aware of no law that requires a district court to rule in favor of an ERISA plaintiff merely because he has supported his claim with substantial evidence, or even with a preponderance." *Id.*

Judicial "review of the administrator's decision need not be particularly complex or technical;

---

[2] It is not clear whether Prudential is responsible for paying out on claims under this plan, such that it has a financial interest in denying benefits. *E.g.*, *Schexnayder*, 600 F.3d at 470 ("Hartford both administered and paid for the Plan. Thus, a decision to pay benefits affects Hartford's bottom-line, because benefits payments come directly from Hartford."); *Ellis*, 394 F.3d at 270 (discussing "legal conflict[s] of interest" in ERISA cases). McFadden argues that a conflict exists. Docket No. 35, at 4-7. Prudential's rebuttal brief several times suggests that a conflict exists, but also describes any conflict as "alleged." Docket No. 44, at 13-14.

"The degree to which a court must abrogate its deference to the administrator depends on the extent to which the challenging party has succeeded in substantiating its claims that there is a conflict." *Ellis*, 394 F.3d at 270 (citation omitted). Here, McFadden has presented no evidence of a conflict, while Prudential's rebuttal brief never denied the existence of a conflict and essentially presented reasons why a conflict should be deemed to be minimal. "The mere fact that a plan administrator is both the claims administrator and the plan funder does not necessarily tip a close case in a plan member's favor." *Leipzig v. Principal Life Ins. Co.*, 707 F. Supp. 2d 685, 694 (N.D. Tex. 2010).

Assuming that Prudential has a conflict of interest, Prudential argues it has attempted to minimize the conflict by hiring outside evaluators and different physicians to review claims. Docket No. 44, at 14. This is one factor weighing in favor of minimizing any conflict. *See Holland*, 576 F.3d at 249 ("although the Plan Administrator ultimately decides whether or not to award a claim, it submits applicants' records to independent medical professionals who have affirmed that they have no conflict of interest and that their compensation is not dependent, in any way, on the outcome of this case."). Therefore, even if a conflict of interest exists, it is "not a significant factor in this case." *Id.*; *see Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 512 (5th Cir. 2010).

3

it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness – even if on the low end." *Holland*, 576 F.3d at 247 (quotation marks and citation omitted).

IV.     Discussion

    A.     Discovery

McFadden claims an entitlement to "discovery to clear up any substantial question on the matter" of his pain condition and functional impairment. Docket No. 35, at 8. McFadden's supporting legal argument, however, is that discovery is necessary to probe the extent of Prudential's conflict of interest. *Id.* at 7. The request for discovery is thus unsupported, because discovery to establish the extent of a conflict of interest is different from discovery to establish a functional impairment.

In any event, the discovery McFadden seeks is not permitted. "[W]ith respect to material factual determinations – those that resolve factual controversies related to the merits of the claim – the court may not consider evidence that was not part of the administrative record unless the evidence relates to how the administrator had interpreted the plan in the past or would assist the court in understanding medical terms and procedures." *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 263 (5th Cir. 2011) (quotation marks, citation, and brackets omitted); *see Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 215 F.3d 516, 521 (5th Cir. 2000) (describing "certain limited exceptions" for when the district court may "stray from" an ERISA administrative record, none of which are present here).

McFadden has not shown an entitlement to discovery. His request will once again be denied. *See* Docket No. 28 (Order of the Magistrate Judge denying McFadden's motion for discovery).

    B.     Short-Term Disability Benefits

McFadden was approved for STD and LTD benefits on December 18, 2001, A.R. 91,[3] and covered under the plan as of January 1, 2002, *id.* at 1338.[4] He was injured on the roof of the Nissan building on January 12, 2002, *id.* at 445 and 476.

The STD plan did not provide benefits when the employee's disabilities were "caused by,

---

[3] The administrative record (cited as "A.R.") is available at Docket Nos. 37-41 and 43-1.

[4] The December 18, 2001 date is when Prudential's medical underwriting department approved McFadden's application for coverage. A.R. 91. The January 1, 2002 date reflects documentation on the employer's side, and may be when the disability coverage went into effect. *Id.* at 1338.

contributed to by, or resulting from . . . occupational sickness or injury." *Id.* at 1519 (emphasis omitted). "Occupational sickness or injury means an injury arising out of, or in the course of, any work for wage or profit regardless of employer, or a sickness covered, with respect to such work, by any workers' compensation law, occupational disease law or similar law." *Id.* Based on this language, Prudential denied McFadden's STD benefits claim because his injuries resulted from a workplace injury. *Id.* at 1447-51 and 1481-82.

McFadden admits that he "was injured on the job." Docket No. 35, at 2. Therefore, the plain language of the policy prevents him from receiving STD benefits. Prudential's denial of STD benefits was correct as a matter of law.

Nor is McFadden entitled to reimbursement for the STD portion of the premiums. As Prudential's rebuttal brief points out, while its STD plan did not cover on-the-job injuries, it did cover non-work-related injuries, and therefore was not illusory. Docket No. 44, at 3; *see* A.R. 1519.

C. *Long-Term Disability Benefits*

1. Factual History[5]

On January 14, 2002, McFadden saw Dr. Anson Thaggard. A.R. 389-90 and 637. McFadden reported pain in his lower neck, right shoulder, right hip and buttocks, and down his right leg. *Id.* at 253. He "[d]id not fall from any height, though," according to Dr. Thaggard, who recommended that McFadden take three days off work and report back in a week. *Id.* at 253 and 262.

On January 21, McFadden went to Montfort Jones Memorial Hospital emergency room for pain in his back, neck, and right leg. *Id.* at 927 and 1074-82. A bone scan two days later showed nothing unusual. *Id.* at 1073.

On January 22, at a follow-up visit with Dr. Thaggard, McFadden reported worse pain. *Id.* at 253. The doctor listed McFadden's "[n]umerous other complaints" that had not been provided the week prior, and wrote that McFadden's behavior was "very dramatic." *Id.*

On January 29, McFadden returned, presenting "once again issues some fairly bizarre symptoms that don't seem to match any specific dermatomal or anatomical pattern known to me," Dr. Thaggard wrote. *Id.* at 392. "Now having pain basically from the top of his neck all the way down his right leg but does not describe a lacerating or radicular-type pain." *Id.* The doctor recommended

---

[5] This time line includes each medical visit of significance within the relevant time period. It does not include every contact McFadden had with medical providers.

5

that McFadden not work through February 5 so McFadden could visit Dr. David Collipp, a physical medicine and rehabilitation specialist, whose decision Dr. Thaggard would defer to. *Id.* at 392 and 480.

On February 5, Dr. Collipp evaluated McFadden and found "mild" back strains. *Id.* at 314. Dr. Collipp recommended further evaluation to determine if McFadden's disc was extruded, and if it was not, McFadden could return to work after two weeks of physical therapy. *Id.* Dr. Collipp and McFadden discussed conducting an MRI. *Id.* McFadden was cautioned to avoid narcotic pain medications and muscle relaxants. *Id.* Dr. Collipp also noted "moderate secondary gain behavior."[6] *Id.*

On February 11, McFadden returned to Montfort Jones complaining of back and neck pain and stating that he ran out of pain medication. *Id.* at 909 and 927. He received a prescription for pain medication. *Id.*

On February 28, a neurosurgical evaluation by Dr. Howard Holaday concluded that an MRI showed a left-side C6-7 disc protrusion. *Id.* at 254; *see id.* at 424.

On March 5, Dr. Holaday saw McFadden for a follow-up and found that McFadden's herniated disc was "the only clearly abnormal finding that correlates with some of his symptoms." *Id.* at 255.

On March 13, McFadden followed-up with Dr. Collipp. *Id.* at 315. The doctor recounted evidence that McFadden had "a possibility, but not a high probability," of needing surgery. *Id.* He also noted that McFadden had undergone three weeks of physical therapy. *Id.* Dr. Collipp found that McFadden was normal "with the exception of poor effort on manual muscle testing," and identified no pain behavior throughout the exam. *Id.* Dr. Collipp identified no physical issue preventing McFadden's return to work "without restrictions," pending Dr. Holaday's clearance. *Id.*

On March 14, Dr. Holaday recommended that McFadden undergo an anterior cervical decompression surgery, and wrote that McFadden should not work until he recovered from that surgery. *Id.* at 920 and 923. The workers' compensation insurer, Liberty Mutual, declined to pay for the surgery, finding that it was "not medically appropriate" because there was "[n]o documentation

---

[6] Secondary gain is "the advantage derived by an individual from being afflicted by a real (organic) illness. The advantage or benefit may be in the form of sympathy, attention, or assistance." 5 Attorneys' Dictionary of Medicine S-78 (J.E. Schmidt, ed. 2005).

to resolve discrepancy of right sided symptoms, left sided disc herniation, or of conservative care except medications." *Id.* at 441 and 1469. Later, Prudential also would complain that Dr. Holaday's surgical recommendation was not supported by documented "focal signs or symptoms." *Id.* at 1470.

On April 22, McFadden returned to Dr. Thaggard complaining of diffuse pain from the base of his neck down the spine to the right knee. *Id.* at 393. Dr. Thaggard noted a good range of motion, no self-reported numbness, a reduced grip strength that "appeared to be fictitious[]," and "[o]ngoing neck and back pain of unclear etiology." *Id.* He thought that McFadden's "pain syndrome is not classic" for the disc problem shown on the MRI. *Id.* After a discussion of the addiction risks presented by OxyContin, Dr. Thaggard filled a prescription for that drug. *Id.*

On May 20, Dr. Thaggard again described McFadden's "very diffuse" pain and noted a "concern[] about some secondary gain issues." *Id.* at 394. Monthly follow-up visits secured refills of OxyContin for 10 months. *Id.* at 394-400. McFadden's request for an increased OxyContin dosage was initially declined, then granted a short time later. *Id.* at 396 and 399.

Between May and July, 2002, McFadden's workers' compensation attorney sparred with the workers' compensation insurer over why McFadden sought surgery to correct a left side disc protrusion when he was experiencing pain along the right side of his body. *Id.* at 442-48. Prudential would later latch onto that dispute in its LTD claim denials. *Id.* at 1450.

On September 17, Dr. Robert Smith, a neurosurgeon, concurred with Dr. Holaday's assessment and added that McFadden "is taking far too much medication and should be weaned and gotten back to some kind of productive activity." *Id.* at 259; *see also id.* at 527. He also noted that McFadden displayed "a give way weakness from all arm muscles."[7] *Id.* at 258.

On November 18, Dr. Thaggard agreed, stating, "I'm not really clear why he is having that

---

[7]

> Give way weakness is a sign of non-organic behavior, and may represent either somatization or malingering. An "organic" issue is one that relates to the body or structure of an organism. Thus, non-organic behavior is behavior unrelated to a physical condition. Somatization is the conversion of an emotional, mental or psychosocial problem to a physical complaint. Malingering is pretending or exaggerating an incapacity or illness so as to avoid duty or work.

*Smorto v. 3DI Technologies, Inc.*, 393 F. Supp. 2d 1304, 1306 n.5 (M.D. Fla. 2005) (citations omitted); *see also* Diagnostic and Statistical Manual of Mental Disorders 739 (4th ed. 2000) (defining malingering as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs").

7

sort of pain. . . . [W]ill try to wean down his pain medications." *Id.* at 398. The following month, though, the pain medication was increased on McFadden's complaints. *Id.* at 399.

In January 2003, McFadden returned to Dr. Holaday. The doctor ordered McFadden to again undergo an MRI. *Id.* at 332. It identified "a small bulge" at C6-7. *Id.* at 333.

On February 20, Dr. Michael Graeber, a neurologist, examined McFadden and found his peripheral nerves and muscle data normal in both arms. *Id.* at 362.

Also on February 20, Dr. Holaday saw McFadden and concluded that the problem noted in McFadden's 2002 MRI – a disc protrusion at C6-7 – was now unremarkable according to the 2003 testing. *Id.* at 336; *see also id.* at 357 and 741-42. "The post myelogram CT scan demonstrates very minor degenerative changes but no significant neural compression that would explain his current symptoms." *Id.* at 336. He recommended "work conditioning therapy." *Id.*

On May 7, McFadden saw Dr. Collipp again, complaining of increased numbness and pain alleviated only by OxyContin. *Id.* at 318. The doctor's report described that although McFadden had a history of a protruded disc that was not operated on, he was otherwise healthy and normal. *Id.* McFadden instead showed "significant secondary gain behavior, without objective signs of physical abnormality, only lack of participation. . . . This is purposeful." *Id.* Dr. Collipp advised McFadden against OxyContin use, then found that McFadden: a) could do Medium-Heavy to Heavy work, b) was 0 percent impaired, and c) had reached maximum medical improvement. *Id.* Dr. Collipp recommended that McFadden return to work and declined to refer him elsewhere. *Id.*

McFadden did not return to work. Instead, on June 13, he started to see Dr. John Adams at the Neshoba Family Medical Center. *Id.* at 806-17. Dr. Adams gave McFadden a prescription for OxyContin and refilled it over the course of five subsequent visits.[8] *Id.*

On July 7, Dr. John Mutziger saw McFadden and noted a neck injury, chronic neck pain, a history of a C5-6 herniated disc, and muscle weakness. *Id.* at 756. He recommended further evaluation by a neurosurgeon or pain management specialist, and warned other providers to screen

---

[8] Because McFadden's brief places weight on Dr. Adams' findings, Docket No. 35, at 13, McFadden's later visits with Dr. Adams will be described here. On February 2, 2004, Dr. Adams wrote that McFadden was permanently disabled. A.R. 520. On February 10, 2004, Dr. Adams wrote a letter stating that McFadden would need OxyContin indefinitely to control pain. *Id.* at 821. An April 2005 note in Dr. Adams' files said McFadden was getting OxyContin and methadone off the street. *Id.* at 828. A November 2005 memo written by Dr. Adams observed that McFadden had been "extremely noncompliant," had "not gone for psychological followup," had "not gone to detox," and was "a very poor candidate for chronic opioid pain management." *Id.* at 829.

8

McFadden's urine for drug abuse. *Id.* Dr. Mutziger also attributed any delay in evaluation to "typical" interplay between workers' compensation and insurance, but recommended surgery only "if he has continued neck pain." *Id.*

On September 22, Dr. Robert McGuire, an orthopedic surgeon, evaluated McFadden and the medical records and determined that he had a herniated disc that resolved by January 2003. *Id.* at 102 and 481; *see also id.* at 539 ("that disc herniation . . . had essentially healed and resolved itself."). Aside from that, McFadden's spine was consistent with his age and his reports of pain were possibly psychological in nature.[9] *Id.* at 102. Dr. McGuire concluded that McFadden's disc herniation resulted in a five percent impairment and that no surgical intervention could significantly improve his symptoms. *Id.* at 103. He deferred to Dr. Collipp's opinion regarding specific limitations, *id.*, stating in a deposition, "Dr. [Collipp] on the 7th of May of 2003 found that [McFadden] was able to perform medium and heavy work activities, and I certainly wouldn't have any disagreement with Dr. [Collipp] there," *id.* at 540. Dr. McGuire testified that McFadden needed no further medical treatment and that his ongoing pain was related to "degenerative changes," not the disc herniation. *Id.* at 542-43. The workers' compensation Administrative Judge concurred in an April 2005 Order. *Id.* at 482-83.

The Administrative Judge also found that McFadden looked for work in October 2003, when he applied for jobs with six specific employers as well as "the employment office." *Id.* at 479.

2. Analysis

The ERISA plan at issue provides LTD benefits when the insured is "unable to perform the material and substantial duties of [their] regular occupation due to [their] sickness or injury," and the insured has "a 20% or more loss in [their] indexed monthly earnings due to that sickness or injury." *Id.* at 1525 (emphasis omitted). Benefits begin only after the insured has been "continuously disabled" for 90 days. *Id.* at 1526. After 24 months of payments, the standard changes, and to continue to receive LTD benefits the insured must show that their sickness or injury prevents them from performing "the duties of any gainful occupation for which [they] are reasonably fitted by

---

[9] Specifically, Dr. McGuire observed that "[s]troking the skin of [McFadden's] neck caused him to complain of pain" and found that "Waddell's findings were present four out of five." A.R. 102. Waddell's findings, or signs, are a clinical method used "to indicate that one or more complaints of pain are not caused by physical abnormality. The presence of three or more of these findings is 'usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality.'" *Mettlen v. Comm'r of Soc. Sec. Admin.*, No. 9:01-cv-28, 2003 WL 1889011, *9 n.15 (E.D. Tex. Apr. 10, 2003) (quoting Attorneys Medical Deskbook 3d § 11:2 (1993)).

9

education, training or experience." *Id.* at 1525.

The administrative record shows that Prudential's decision to deny LTD benefits was supported by substantial evidence and not arbitrary or capricious. McFadden's inability to work was not substantiated on the record. Within a month of the accident, one doctor noted McFadden's "dramatic" behavior and "bizarre" symptoms not rationally connected to his injuries, while another doctor found "moderate secondary gain behavior." In the next two months, a third doctor found that McFadden's herniated disc was the only injury correlated with McFadden's symptoms. Later, a fourth doctor noted that the herniated disc issue had resolved itself by 2003, and then testified that McFadden's ongoing pain was likely caused by degeneration, not by his workplace injury. At no point was a formal functional capacity evaluation ordered or conducted. *See id.* at 666-67 and 945-46. And there is no substantiation in the record that McFadden was prevented from doing his job as a result of the injuries he sustained in January 2002, as opposed to the subjective pain he experienced that the doctors could not verify. Instead, the common thread weaving through the record is multiple doctors' skepticism about McFadden's symptoms and purpose in seeking medical attention, related to their concern that he was attempting to feed an addiction to narcotics. The evidence in the administrative record is indeed "substantial evidence," in that it is "more than a scintilla . . . and is such relevant evidence as a reasonable mind might accept as adequate to support [Prudential's] conclusion." *Ellis*, 394 F.3d at 273 (citation omitted).

At first blush, Prudential's decision does conflict with the Social Security Administration's finding that McFadden is totally disabled.[10] *See* A.R. 573 (Social Security Administration Notice of Decision). Prudential argues that this is understandable because unlike Social Security it does not defer to a treating physician, and because McFadden had a "listed impairment" that received presumptive approval for disability benefits under Social Security regulations. Docket No. 44, at 7-8. It adds that McFadden did not provide the Social Security Administration with all of the documentation of non-disability contained in its own administrative record. *Id.* at 8. McFadden's sur-reply did not address these arguments. Docket No. 45.

The fact that the Social Security Administration reached a particular conclusion is not determinative of an ERISA claim. "Differences between the Social Security disability program and

---

[10] On the other hand, the workers' compensation determination accords with Prudential's decision, because both found insufficient evidence that McFadden was fully disabled and could not return to work. A.R. 482.

ERISA benefits plans caution against importing standards from the first into the second." *Hammond v. UNUM Life Ins. Co. of Am.*, No. 3:05-cv-632, 2008 WL 906522, *11 (S.D. Miss. Mar. 31, 2008). The federal rules and regulations governing Social Security determinations do not apply to the terms contained in ERISA plans for LTD benefits. *Id.* "So, the determination that a claimant suffers from a disability under Social Security regulations does not require an ERISA plan administrator to reach the same conclusion." *Id.* (citation omitted).[11]

Instead, the ERISA administrator's duty is to address a contrary Social Security determination. An administrator's "[f]ailure to address a contrary SSA award can suggest 'procedural unreasonableness' in a plan administrator's decision," and can be one factor supporting that a denial of LTD benefits was arbitrary and capricious. *Schexnayder*, 600 F.3d at 471 (citation omitted); *see Hamilton v. Standard Ins. Co.*, 404 F. App'x 895, 898 (5th Cir. 2010) (unpublished). Even where substantial evidence supports the denial of benefits, a failure to address a Social Security award can be a "tiebreaker" to conclude that the insurer abused its discretion. *Id.*

Here, Prudential acknowledged the contrary Social Security award at least twice. On March 31, 2009, it explained over the phone to McFadden that a federal finding of disability was not determinative of LTD benefits, in light of the inconsistencies in the record. A.R. 1441. And on December 30, 2009, Prudential acknowledged in a denial letter that McFadden had been approved by Social Security for disability benefits. *Id.* at 1458.[12] While Prudential could have provided a more thorough written explanation, these acknowledgments were sufficient. *See Schexnayder*, 600 F.3d at 471 n.3. ("We do not require Hartford to give any particular weight to the contrary findings; indeed, Hartford could have simply acknowledged the award and concluded that, based on the medical

---

[11] One reason for this difference is that when assessing Social Security disability claims, the ALJ and the courts must give "due regard for the beneficent purposes of the legislation" and apply "a more tolerant standard" than that which is used in a typical suit. *Ventura v. Shalala*, 55 F.3d 900, 902 (3rd Cir. 1995); *see Moran v. Astrue*, 569 F.3d 108, 112 (2nd Cir. 2009) (the Social Security Act is to be "liberally applied" because "it is a remedial statute intended to include not exclude").

[12] The Court places less weight on another of Prudential's formal denial letters, which mentioned the contrary Social Security award only by listing it as one of the sources considered. A.R. 1449. In addition, another note in Prudential's file discussed the Social Security award, but only to conclude that it would not be an offset against its own award, if any. *Id.* at 1402. These records do not address why the reviews arrived at different conclusions. And yet it also seems relevant that the Social Security award would not offset Prudential's disability insurance, which suggests that Prudential would not "reap[] a financial benefit of its own" from the positive Social Security finding. *Glenn v. MetLife*, 461 F.3d 660, 667 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

11

evidence before it, the evidence supporting denial was more credible.").

Finally, the administrative record also contains numerous medical records documenting visits and procedures after September 2003, including a disc fusion surgery in May 2008. *E.g.*, A.R. 585-633, 748-51, 858. Just in 2004, for example, at least four new doctors saw McFadden or evaluated his test results. Docket No. 32, at 10. And McFadden's brief has placed great weight upon the post-2003 opinions of Dr. Adams, which were recounted above. Docket No. 35, at 13.

These documents do not prove McFadden's entitlement to LTD benefits for two reasons. First, the standard of review requires only that Prudential have more than a scintilla of evidence that McFadden was not prevented by injury from working; it does not ask whether McFadden suffers from pain, needed surgery at a later date, or subsequently was determined to be disabled by one doctor or the Social Security Administration. *See Ellis*, 394 F.3d at 273.[13] Second, the collective medical findings, most especially the findings of Drs. Collipp and McGuire in May and September 2003, respectively, are substantial evidence that any injuries McFadden suffered on the roof of the Nissan plant did not prevent him from working. Dr. Adams' perspective was the outlier.

There may have been other illnesses or causes of pain that struck McFadden after September 2003 that would not qualify for coverage under Prudential's plan, but still resulted in his need for later procedures or prevented him from working. As late as eighteen months after his injury, though, the state of the evidence reasonably supported Prudential's decision.

In conclusion, Prudential's denial of benefits was supported by substantial evidence and was not arbitrary and capricious.

V. *The Remaining Defendant*

Granting summary judgment to Prudential leaves McFadden's former employer, defendant Encompass Mechanical Services Southeast, remaining on the docket sheet. And interspersed with his ERISA arguments, McFadden occasionally charges Encompass with unlawful termination. *E.g.*, Docket No. 35, at 14.

That assertion cannot be resolved in this suit, which is solely an action to recover ERISA benefits. Page one of McFadden's complaint says that it is an "Employee Retirement Income Security Act (ERISA) Complaint." Docket No. 1, at 1. The "Claims" section of that Complaint only takes

---

[13] Nor is Dr. Adams' purported report at A.R. 748 sufficient. That document may have been filled out by "the claimant," not Dr. Adams. The Court has recited Dr. Adams' verified opinions above.

issue with Prudential's denial of benefits, *id.* at 9-11, and the "Conclusion" and prayer for relief sections seek judgment and relief from Prudential only, *id.* at 46-47. McFadden's later pleadings confirm the nature of his suit. *E.g.*, Docket No. 30, at 3 ("case No. 3:11-cv-108 is an ERISA case")[14] and 6 ("the instant case is purely an ERISA case in which the Plaintiff seeks to acquire from Prudential his STD and LTD").

McFadden once argued that he sought relief from Encompass to the extent its actions or inaction affected Prudential's "responsibility to provide [STD] and [LTD] benefits to the Plaintiff under the Plan in question." *Id.* at 4. During the summary judgment stage, though, Encompass's acts or omissions were not made an issue in the claim denial; Prudential defended its decision on the merits. McFadden's theory will no longer suffice to keep Encompass as a defendant.

The fact that this is "purely an ERISA case" means Encompass must be dismissed, because in an action to recover ERISA benefits the health care plan is the only proper defendant. *See Walker v. Kimberly-Clark Corp.*, No. 1:08-cv-146, 2010 WL 611007, *6 (N.D. Miss. Feb. 17, 2010) (collecting cases); *Hill v. Aetna Life Ins. Co.*, 546 F. Supp. 2d 343, 347-48 (S.D. Miss. 2008). Whatever claims McFadden may have against Encompass are not the subject of this suit. Encompass will be dismissed.

*VI.    Conclusion*

Prudential's motion for summary judgment [Docket No. 31] is granted. McFadden's motion for summary judgment [Docket No. 35] is denied. Encompass is dismissed. A separate Final Judgment will issue this day.

**SO ORDERED**, this the 10th day of July, 2012.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE

---

[14] *See McFadden v. Abston et al.*, No. 3:06-cv-324-HTW-LRA, in which McFadden has sued his workers' compensation attorney, Nissan North America, Encompass, and other defendants, alleging a variety of claims. The Court observes that ERISA and ERISA-type claims are mentioned multiple times on that docket sheet, even though Prudential was never served. *See* Minute Entry dated October 10, 2007 and Docket No. 148. In addition, that suit was filed before Prudential's denials of coverage. This suit is the only proper ERISA suit pending in this District.